Filed 11/30/22

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re G.Z., a Person Coming Under the Juvenile Court Law. | B313378 |
| | (Los Angeles County Super. Ct. No. 20CCJP03156) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| KIMBERLY D., | |
| Defendant and Appellant. | |

APPEAL from findings and order of the Superior Court of Los Angeles County, Steff Padilla, Juvenile Court Referee. Reversed and remanded with directions.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————

## INTRODUCTION

Kimberly D. (Mother) appeals from the juvenile court's jurisdictional finding and dispositional order as to her minor child, G.Z. First, Mother contends the evidence was insufficient to support the court's finding that her minor son's subdural hematomas were the result of her neglectful acts. Second, Mother argues her due process rights were violated when the juvenile court relied on Welfare and Institutions Code[1] section 355.1's rebuttable presumption in finding neglect by Mother when it "never notified its intent to do so until all parties had argued and submitted the case."

Given the lack of substantial evidence, we reverse the order of the juvenile court asserting jurisdiction, vacate the court's factual findings, and direct the juvenile court upon remand to dismiss the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Referral and Investigation*

On June 4, 2020, the Los Angeles County Department of Children and Family Services (DCFS) received an immediate response referral for Mother's 10-month-old son, G.Z. (born July 2019). The caller reported G.Z. was admitted to the hospital five days before, on May 31, 2020, due to persistent vomiting. The caller further reported MRI and CT scan results showed G.Z. had two older subdural hematomas (brain bleeds) and one new subdural hematoma. Mother, then 20 years old, "could not

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

explain the cause of the . . . hematomas." The caller suspected "possible physical abuse."

That same day, a children's social worker (CSW) with DCFS conducted multiple interviews. The CSW first contacted Dr. Kevin Waloff of Children's Hospital Los Angeles (CHLA). Dr. Waloff stated "there is no medical explanation" for the hematomas and was waiting for test results to discern if G.Z. had a bleeding disorder.

The CSW also contacted CHLA nurse practitioner (NP) Amarra McHale, who reported Mother stated G.Z. fell off the bed about two months ago "while co-sleeping" with her. The NP believed "a simple fall would not cause these injuries and that it is caused by blunt force or vigorous shaking." Per the NP, Mother took G.Z. to St. Joseph's Hospital two weeks prior and to CHLA on May 26, 27, and 31, 2020.

The CSW met with Mother and G.Z., who appeared "bonded" with Mother and comfortable in her presence. The CSW did not observe any marks or bruises on G.Z.'s body or head. Mother explained she is no longer in a relationship with G.Z.'s father Robert Z. (Father), who has not been involved in G.Z.'s life for the past nine months. Mother resides with her parents— G.Z.'s maternal grandfather (MGF) and maternal grandmother (MGM); her two adult siblings—G.Z.'s maternal aunt (MA) and maternal uncle (MU); and one minor sibling—G.Z.'s maternal uncle (minor MU). Mother's family babysat on prior occasions while she was at work or taking online classes. Mother has "no suspicions" a family member would harm G.Z.

Mother explained that sometime in April, she and G.Z. were co-sleeping in her bed, as G.Z. did not like sleeping in his crib; "as a precaution, she laid pillows around the bed to create a

3

border of protection" for G.Z., but he "fell off the side of the bed onto the carpet." Mother stated G.Z.'s head may have hit the wall near the bed. G.Z. cried and Mother consoled him. Mother stated there was another incident almost a month ago where G.Z. fell out of MGF's arms and onto the kitchen floor when "attempting to get into the kitchen cabinets." Mother explained G.Z. recently "started to move around a lot" and "want[s] to walk unassisted."

Mother stated it was not until two weeks ago when G.Z. began vomiting consistently. Mother first thought it was "a stomach issue" but grew "very concerned" when symptoms persisted. She took G.Z. to the emergency room at St. Joseph's Medical Center (St. Joseph's). G.Z. was prescribed Zofran to stop the vomiting. Mother administered the medicine but it did not help with G.Z.'s vomiting. Mother then took G.Z. to CHLA "due to their reputation and hoping for better care." G.Z. was prescribed Zofran again. Because G.Z.'s symptoms persisted the next two days, Mother returned to CHLA on May 31, 2020. G.Z. was admitted and further tests conducted. MRI results showed he had two old hematomas and one new. Mother had no explanation for them except for the two falling incidents she disclosed.

The CSW conducted an unannounced home visit and found Mother's home clean, adequately furnished, and stocked with sufficient food supply. The CSW observed Enfamil baby formula, bottles, baby snacks, and a car seat.

The CSW interviewed MGF, who was "visibly upset" and "tearful." MGF stated he was aware G.Z. had fallen off the bed two months ago because Mother told him about it. MGF explained G.Z. did not show "any concerning symptoms" after

4

that incident. MGF stated G.Z. fell on the kitchen floor about "17-20 days ago" while MGF "was guiding [G.Z.] by his hands as he attempted to walk across the cabinets." G.Z. was trying to walk on his own and "lost his balance"; MGF was unable to catch him "before he fell back on his head." G.Z. cried "a little" but was "easily comforted." MGF described the incident as "accidental." He stated he "loves his grandson" and that G.Z. is "well taken care of" and supervised at all times.

MGF stated G.Z. started showing concerning symptoms, like vomiting, about one to two weeks ago. The "whole family was very concerned." MGF stated Mother went to the hospital to get G.Z. medical attention on three separate occasions; "the hospitals kept sending [G.Z.] home" and Mother "kept returning to get help." MGF did not understand why there were allegations against Mother.

The CSW interviewed MU next. MU was aware G.Z. had fallen off the bed two months ago because Mother told him after it happened. MU stated he was also aware of G.Z.'s falling incident while under MGF's supervision. MU stated G.Z. appeared "normal" and exhibited no symptoms at that time. Once G.Z. started vomiting, "the family sought help." MU denied any concerns that G.Z. was neglected. He has never witnessed Mother or any family member hit, shake, or push G.Z.

The CSW interviewed MA, who stated she was awake when G.Z. fell off the bed. MA recalled hearing a "loud thump" and went into the bedroom and observed Mother consoling G.Z., who was crying. MA stated she was also aware of the falling incident with MGF; she stated G.Z. "likes to try to walk on his own and fell." G.Z. did not show any symptoms until "1–2 weeks ago"

5

when he started vomiting. MA never witnessed Mother hit or shake G.Z. and believed G.Z. is well cared for.

The CSW also interviewed minor MU, who was aware G.Z. had fallen off the bed two months ago but was not aware of G.Z.'s falling incident in the kitchen. Minor MU had no concerns that anyone in the home would harm or neglect G.Z.

MGM was "crying uncontrollably" during her interview with the CSW, stating her "heart was being ripped out of her chest" because DCFS was "tak[ing] the baby away." MGM stated "the entire situation" was a result of "her error" because she advised Mother not to take G.Z. to the hospital when he "appeared to be fine" after falling "off the bed onto a carpeted floor." MGM stated Mother sought medical care for G.Z. when he started vomiting two weeks ago. Mother returned to the hospital because G.Z. was not getting better and the doctor informed her that G.Z. "ha[d] blood in his skull." MGM denied any abuse or neglect. She stated Mother is very loving towards G.Z. and provides him plenty of food, clean clothes, and regularly bathes him. MGM stated this is the first time they had any involvement with DCFS.

Mother voluntarily agreed that G.Z. would temporarily reside with G.Z.'s paternal aunt (PA) for one week per the "voluntary safety plan" proposed by DCFS. PA denied having any concerns that Mother or Mother's family would harm G.Z. PA stated she has observed Mother "being caring and loving" towards G.Z. PA stated she has contact with G.Z. once a month. She was aware Father denied paternity and "has not provided the support he needs." PA stated Father's decision not to be involved in G.Z.'s life has caused "dissension in the family."

The CSW conducted a telephonic interview with Father, who was unaware G.Z. had hematomas and was hospitalized. He denied having concerns about Mother or her family, but stated he had no contact with them since G.Z. was three weeks old. Father "attempted to file for 50/50 custody but then withdrew"[2] and wanted a paternity test. Father is unemployed. He confirmed he is no longer in a relationship with Mother and was now living with girlfriend Sophia. Father did "not feel comfortable with [G.Z.] temporarily residing with PA as there has been familial conflict." Father stated he could provide for G.Z.'s needs and has support from Sophia and her family.

The CSW assessed Father's home and found it clean, furnished, and with sufficient food supply. There was a room prepared for G.Z. with a crib, stroller, and car seat. The CSW informed Mother that Father wanted to care for G.Z.; Mother was emotional and cried. She expressed concern that G.Z. was not familiar with Father, who had no experience caring for G.Z. She nonetheless agreed to Father caring for G.Z. as part of the voluntary safety plan and requested DCFS provide counseling to Father about co-parenting. G.Z. was temporarily placed with Father on June 5, 2020. The CSW reiterated to Father that Mother is allowed telephonic contact with G.Z.

DCFS obtained some medical records, including pediatric trauma consult notes dated June 3, 2020 that specify G.Z.'s vomiting "remained unresolved and was unresponsive to [Z]ofran." The CT scan of G.Z.'s head demonstrated "arachnoid

_____

[2]    On May 7, 2020, Father had filed a parentage petition in family court, requesting joint legal and physical custody of G.Z., and visitation rights.

granulation and epidural hematoma," while the MRI showed "bilateral chronic subdural hematomas and subacute hematoma in the left middle fossa."  The notes provide Mother denied any recent history of trauma and explained that G.Z. fell "from a bed onto a carpeted floor 2-3 months ago."  The notes further provide Mother reported G.Z. had consistent emesis, leading her to take G.Z. to hospitals "a total of 4 times."  The notes describe G.Z.'s head as "atraumatic."

On June 8, 2020, a removal order was sought and granted against Mother, "due to allegations of physical abuse by an unknown perpetrator and general neglect by mother."  G.Z. remained in Father's care.

On June 10, 2020, Mother contacted the CSW and stated she discovered the timeline of specific incidents by reading through her text messages.  Per Mother, G.Z. started vomiting on May 20, 2020 and she took him to the hospital the following day.  She stated G.Z. fell in the kitchen while with MGF on May 23, 2020.

B.    *Petition and Detention*

On June 11, 2020, DCFS filed a Welfare and Institutions Code section 300 petition on G.Z.'s behalf.  It alleged:

- Counts a-1, b-1:  G.Z. was hospitalized on May 31, 2020. G.Z. was suffering from "persistent vomiting" for two weeks and a "detrimental condition consisting of arachnoid granulation and epidural hematoma, bilateral chronic subdural hematomas and subacute hematoma."  Mother's explanation of how G.Z. sustained the injuries was "inconsistent with the child's injuries."  The injuries were consistent with "non-accidental trauma" and would not ordinarily occur but

8

for "deliberate, unreasonable, and neglectful acts" by Mother who had care and custody of G.Z. "Such deliberate, unreasonable and neglectful acts [by] [M]other endanger [G.Z.'s] physical health and safety and place [him] at risk of serious physical harm, damage and danger."

- Count b-2: Mother "failed to obtain timely necessary medical treatment" for G.Z. Mother's failure to obtain timely medical treatment for G.Z. endangered his physical safety and placed him at risk of serious physical harm and danger.

- Count e-1: G.Z.'s injuries are consistent with non-accidental trauma. Such "physical abuse was excessive" and caused G.Z. "unreasonable pain and suffering." Mother knew or reasonably should have known G.Z. was being physically abused and failed to protect him. Mother's failure to protect G.Z. endangered his physical health and placed him at risk of serious harm.

A physical examination of G.Z. was conducted on June 15, 2020. The notes provide there was "[n]o bruising or other signs of external trauma" and specified "macrocephaly" (i.e., an enlarged head or swelling of the brain).

At the detention hearing on June 16, 2020, Mother denied the allegations against her. The juvenile court found Father "to be the presumed father of the minor child." It found "a prima facie showing" that G.Z. is a person described by section 300, subdivisions (a), (b), and (e). The juvenile court found no reasonable means by which G.Z.'s physical or emotional health could be protected without removal and ordered G.Z. removed

9

from Mother and released to Father's home and care, under DCFS supervision. The court ordered monitored visitation for Mother, a minimum of two hours twice a week, with DCFS discretion to liberalize. The court also ordered monitored visitation for maternal grandparents with DCFS discretion to liberalize.

C.      *Developments during Dependency Proceedings*

The CSW researched Mother's and Father's criminal history; their CLETs results displayed no criminal history. It was also confirmed G.Z.'s family had "no prior history" with DCFS.

Mother continued her monitored visits with G.Z. three times a week for two hours a visit. No problems or concerns were reported. The CSW described Mother as "cooperative" and that she has "an emotional bond" with G.Z.

On October 6, 2020, the CSW interviewed Father. He stated when G.Z. was initially released to him, G.Z. "would cry [and] grab his head, as if he was in pain, however, he is no longer doing this." He stated G.Z. was "developing well" while in his care. Father reported he obtained employment and was working at a car lot owned by his now fiancée Sophia.

DCFS submitted to the court copies of medical/patient notes on G.Z. Radiology results from June 1, 2020 state G.Z. had "subdural hematomas on imaging with no reported history of trauma." Dr. Sarah Weber "[r]ecommended complete non-accidental trauma workup." The June 4, 2020 preliminary report prepared by CHLA staff states the imaging results showed a hematoma and cyst; given the findings, an MRI was done, which showed a bilateral subdural hematoma and a more recent subacute hematoma. "After discussing the images with radiology

10

and neurosurgery[,] the possible causes were trauma, cyst rupture was less likely, and bleeding disorders [work up] . . . was done which did not reveal other fractures and/or laboratory findings."

DCFS interviewed Mother on October 14, 2020. Mother stated she took G.Z. to the hospital three times before he was admitted and, later, discovered "two hematomas and a cyst in his brain." Mother confirmed G.Z. fell "on two occasions"—once in March 2020 while co-sleeping with him in bed and woke up to "a loud thump" when he fell off the bed and "might have hit his head against the wall," and once on May 23, 2020 when G.Z. was playing with MGF in the kitchen and "fell on his bottom [when he] pushed himself backwards on the ground and hit his head." Mother stated G.Z. did not start vomiting until after the fall on May 23.

A letter sent on October 8, 2020 from Dr. Karen Imagawa, director of the CARES Team at CHLA, summarized the relevant medical history of G.Z., including his multiple hospital visits and check-ups, as follows.

On May 20, 2020, Mother took G.Z. to St. Joseph's due to "concerns for repeated vomiting episodes starting the prior day." G.Z. was noted as being "well appearing, active and playful."

On May 24, G.Z. was brought to CHLA and described as having "nonbilious, non-bloody vomiting, decreased energy with increased sleepiness." An abdominal x-ray and intussusception ultrasound "revealed no evidence of intussusception or other signs of bowel obstruction." G.Z. was provided anti-nausea/vomiting medication.

Two days later, on May 26, Mother returned to CHLA with G.Z., described as having "recurrent non-bilious, non-bloody

11

vomiting, decreased urine output and fatigue."

On May 29, G.Z. had a "virtual visit (due to the COVID-19 pandemic)" with his primary care provider. Mother reported that G.Z. vomited soup the previous day but is now able to tolerate fluids. G.Z. was diagnosed with gastroenteritis.

On May 30, Mother brought G.Z. to CHLA again due to recurrence of vomiting. G.Z. was described as "tired and pale." A CT scan of G.Z.'s head yielded intracranial hemorrhages, leading to CHLA admitting G.Z. "for further evaluation and care."

On June 1, an MRI confirmed G.Z. had a "[l]eft subacute subdural hematoma (~1-2 weeks of age) around an arachnoid cyst." There were also "[b]ilateral (right and left sided) older/chronic subdural hematomas . . . but no older than ~30 days of age."

On June 2, pediatric ophthalmology consultation revealed "no evidence of retinal hemorrhages or other signs of ocular trauma." A skeletal survey showed no evidence of fractures. "Investigating agencies were notified" due to "concerns for possible non-accidental/inflicted trauma" because Mother and her family provided "inconsistent histories regarding possible head trauma."

Dr. Imagawa noted G.Z. was reportedly "doing very well" during a CARES clinic visit on June 15, 2020. There was no recurrence of vomiting. The notes stated G.Z. has macrocephaly.

During G.Z.'s neurosurgery clinic visit on July 8, 2020, a recent MRI revealed "a decrease in size of the . . . left (subacute) subdural hematoma around the arachnoid cyst, but with an increase in size of the . . . left (older) subdural hematoma."

12

On September 29, 2020, an MRI revealed G.Z.'s arachnoid cyst had stabilized.

Dr. Imagawa's October 8, 2020 letter next included her opinion and assessment: Intracranial injuries such as subdural hematomas in otherwise healthy infants "from causes other than trauma are rare." Subdural hemorrhage can occur as a contact injury, i.e., blunt trauma to the head, where bleeding may result from skull impact or fracture, and can also occur with noncontact injury, such as "vigorous shaking." In G.Z.'s case, given the evidence of the arachnoid cyst, "it is conceivable that the subacute hemorrhage noted around the cyst is related to bleeding from (rupture of) the cyst which can occur from minor trauma." If G.Z. did indeed hit his head during the kitchen fall incident on May 23, 2020, that "could explain the subacute subdural hematoma . . . around the arachnoid cyst."

However, G.Z.'s older/chronic subdural hematoma "still remains a concern." This older subdural "may be due to either, or both, a contact or non-contact mechanism." The increase in G.Z.'s head circumference "may, at least in part, be the result of the development[] of the subdural hematomas." The MRI brain findings "may be related to [G.Z.'s] developmental course or may be the sequelae of previous head trauma; however, based on the available information if is difficult to differentiate which is more likely." Dr. Imagawa opined it "could be possible . . . that these findings *might* put [G.Z.] at some increased risk to sustain subdural hemorrhage from more minor trauma." However, because "there is no reported history of head trauma (even minor) that coincides with the estimated dating of the older subdurals — the fall from the bed is too long ago, and the fall in the kitchen is too recent." As such, "non-accidental/inflicted trauma as the

13

cause of [G.Z.'s] older subdural hematoma remains a concern and cannot be excluded."

Dr. Imagawa's letter concluded: "Of note, it appears that mother was diligent in seeking consistent routine pediatric care for [G.Z.] as well as . . . diligent and persistent in appropriately continuing to seek care for [his] symptoms of vomiting."

During the hearing held November 10, 2020, the juvenile court granted Mother's request that her visitation be liberalized and ordered unmonitored visits for Mother for up to three hours, with discretion to DCFS to liberalize. Mother and Father informed the court that they planned visitation over the holidays, such that Mother will spend Thanksgiving Day, Christmas Day, and New Year's Day with G.Z.

On January 5, 2021, DCFS submitted a last minute information (LMI) and notified the court Mother "has been consistent with her visits" with G.Z., who was now 16 months old. During a hearing held that day, the court ordered G.Z. released to both parents, under DCFS supervision. The court ordered a joint 50/50 physical custodial schedule where G.Z. is with Mother on Mondays and Tuesdays, with Father on Wednesdays and Thursdays, and with alternating weekends, Friday to Sunday— known as the "2-2-5" custodial plan.

On January 20, 2021, DCFS submitted another LMI, notifying the court that Mother's expert Dr. Michael Weinraub[3] is

_____

[3] Dr. Weinraub has been a licensed physician since 1975 and board certified in general pediatrics since 1978. Dr. Weinraub gained "extensive hands-on experience caring for tens of thousands of children . . . as an inner-city pediatrician in Los Angeles" and has "developed comprehensive clinical pediatric experience differentiating accidents and medical problems from

14

prepared to testify that G.Z.'s medical condition, macrocephaly, i.e., an enlarged head or increase in size of the cranium, "made him susceptible to subdural hematomas." G.Z.'s first subdural was "at the time of birth, or maybe even before." G.Z. has a left temporal subarachnoid cyst that "bleeds easily" and "could have been bleeding since birth." The cyst could have caused "a spontaneous bleed" and could result from "normal handling of a child." G.Z.'s neomembranes (tissues) may "bleed with minor trauma." Dr. Weinraub found no indication of abuse and did not find in G.Z. signs indicative of a "shaken baby."

The CSW spoke with Dr. Imagawa, who stated that "essentially she and Dr. Weinraub are saying the same thing, except as to the dating" of the older subdural hematoma. Dr. Imagawa indicated the older subdural hematoma is "no more than 30 days old" per the MRI results.

D. *Adjudication*

The jurisdictional and dispositional hearings took place January 22 and March 24, 2021.

Dr. Weinraub, deemed an expert in general pediatrics by the court, testified at length. In preparation, he reviewed records

---

child abuse-related presentations." Dr. Weinraub taught pediatric residents from UCLA, USC, and Kaiser Medical Center. Dr. Weinraub was also the Los Angeles County Edmund Edelman Children's Court Pediatrician from 2001 until 2013, and "was assigned by judges' court orders to more than [1,000] child abuse cases." In this court role, Dr. Weinraub "encountered cases of children that were misidentified as child abuse, which were instead cases of medical conditions that mimicked abuse, including cases involving the controversial diagnosis of shaken baby syndrome."

15

from St. Joseph's and CHLA, x-rays, radiology studies, outpatient pediatric records, and G.Z.'s birth records. G.Z. had a left temporal arachnoid cyst, a medical condition that is congenital and has "been there since birth," which can "bleed spontaneously" and "cause chronic subdural hematomas." He explained that G.Z. suffered from chronic neomembranes that formed in his subdural, which can "cause rebleeding and expand the subdural." He agreed with Dr. Imagawa that "the subacute subdural hematoma can be a result of the arachnoid cyst and not due to significant force from inflicted trauma." G.Z. "had large arachnoid spaces which can bleed spontaneously or from minor trauma. [Dr. Imagawa] said it rarely happens but it could have happened in this case. So I would agree with her on that."

He opined the arachnoid cyst caused G.Z. to suffer the bleedings with "normal" or "non-abusive" handling of G.Z. The increased subarachnoid spaces made G.Z. more likely to have subdural hematomas and "reduce[d] the amount of trauma that it would take to cause bleeding because the veins are stretched." G.Z. had macrocephaly at birth and children born with macrocephaly are "more likely than not to get a subdural hematoma which would then go on to become chronic subdural." However, Mother did not find out and was not aware that G.Z. had a cyst in his head until receipt of the CT scan results at CHLA on May 31, 2020.

The persistent vomiting G.Z. experienced "if forceful enough, could cause some bleeding but also the bleeding and the subarachnoid cyst cause persistent vomiting because there's consistent pressure on the brain." Dr. Weinraub opined that G.Z. does not suffer from shaken baby syndrome, now called "acute head trauma syndrome" because the there was no indication of

16

abuse, i.e., "injuries . . . caused by acceleration and deceleration injury, for example, retinal hemorrhages," "classic metaphysical lesions," "rib fractures." There was "no indication that this child has suffered any sort of abuse or neglect."

Dr. Weinraub found no signs of medical neglect by Mother and thought she did "an exemplary job." Mother took G.Z. to the hospital five times in nine days. He stated that co-sleeping with a child of this age is "considered not appropriate by the American Academy of Pediatrics," but confirmed there is no evidence Mother's co-sleeping with G.Z. caused him any harm.

On March 22, 2021, Mother submitted a declaration stating she first took G.Z. to St. Joseph's on May 20, 2020 because he had been vomiting for a few days and was not getting better. G.Z. was prescribed Zofran. She followed the instructions given for administering the Zofran, but G.Z. did not improve. He continued to vomit whenever he ate. On May 24, 2020, she took G.Z. to CHLA because he was not getting better. She told them the Zofran was not working, but the doctors instructed her to keep giving him the Zofran. They did not admit G.Z. Then, on May 26, 2020, she returned with G.Z. to CHLA because he continued to vomit any food he was given and the Zofran did not help G.Z.'s symptoms improve. The doctors told her to stop giving him Zofran, but did not admit G.Z. then either. Shortly after midnight, Mother again took G.Z. to CHLA because he was not improving. It was at this point when CHLA admitted G.Z. When CHLA "wanted to release" G.Z. on May 31, 2020, Mother "would not consent to his release" and "asked for further testing to see what was causing [G.Z.] to vomit." It was then when CHLA performed further testing on G.Z. and discovered the subdural hematomas.

17

On March 23, 2021, DCFS submitted a LMI notifying the court of a letter from Dr. Benita Tamrazi, a board certified neuroradiologist since 2012, director of neuroradiology at CHLA since 2018, and expert in pediatric neuroradiology. The letter provided: Dr. Tamrazi's expertise and opinion is in the area of neuroimaging and, specifically for this case, his opinion on the approximate aging of blood in G.Z.'s brain MRI results dated June 1, 2020. In terms of aging, blood product in brain is described as acute if up to seven days old, subacute if more than seven days but less than 30 days old, and chronic if more than 30 days old. "When determining the approximate age of blood products, it is critical to look at the appearance of the blood products relative to the appearance of cerebrospinal fluid (CSF) within the ventricular system and subarachnoid spaces." Dr. Tamrazi viewed G.Z.'s imaging and found G.Z.'s blood products "are brighter than the CSF, which is not consistent with chronic subdural hematomas." Based on the imaging and his expertise as a pediatric neuroradiologist, Dr. Tamrazi opined G.Z.'s subdural hematomas on the MRI dated June 1, 2020 are not chronic and thus less than 30 days old.

On March 24, 2021, minor's counsel argued DCFS "failed to show that [G.Z.] has suffered or [is at] substantial risk of suffering serious physical harm as a result of Mother's conduct." Minor's counsel "point[ed] out how diligent Mother was in obtaining medical care for [G.Z.]" and referred to the hospital visits on May 20, 24, 26, 27, and 30, 2022. Minor's counsel requested that the petition against Mother be dismissed.

After hearing argument from all parties, the juvenile court stated its ruling. It cited to section 355.1, subdivision (a) and the presumption affecting the burden of producing evidence. The

18

court made "a finding that this child would not have suffered the injuries except for the unreasonable or neglectful acts of the Mother." The court "was troubled by the fact that Mother's own expert talked about possibly neglectful or unreasonable acts." The court continued: "And I want to be very clear that it is not just about co-sleeping. [T]he court has [a] child that has had multiple subdural hematomas, multiple bleeds while in the custody of the Mother, and since the child has been in the custody of the Father [and] since they've been sharing custody and they have a parenting plan, there hasn't been any new injuries."

The juvenile court dismissed counts a-1, b-2, and e-1, and sustained count b-1, finding it true by a preponderance of the evidence. "Mother does not have a reasonable explanation, while this child is in her sole custody, continued to have brain bleeds, continued to have subdural hematomas with multiple falls." The court stated: "It's just an ongoing pattern. Mother does something. Child gets hurt. Mother doesn't do something. Child gets hurt. Multiple falls and this child gets hurt."

The court proceeded to disposition. The court found G.Z. a dependent of the court under section 300, subdivision (b). It further found "release of the child to the parents would not be detrimental to the safety, protection, or physical or emotional well-being of the child" and ordered G.Z. released to the "home of parents" under DCFS supervision. Mother and Father were to continue sharing 50/50 custody of G.Z. with the previously agreed upon "2-2-5" custodial plan. The court-ordered case plan for Mother and Father included completing a parenting program for special needs children.

Two days later, Mother filed her notice of appeal.

E.   *Post-Disposition Events*

On September 22, 2021, while Mother's appeal was pending, the juvenile court found the conditions that justified the initial assumption of dependency jurisdiction no longer exist and are not likely to exist if supervision is withdrawn and terminated jurisdiction with a custody order awarding the parents joint legal and physical custody.  The juvenile court stayed the termination of jurisdiction pending its receipt of the custody order.  On October 8, 2021, the custody order was filed, the stay lifted, jurisdiction terminated, and G.Z. was released to his parents.

On August 3, 2022, pursuant to Government Code section 68081, we invited both parties to submit supplemental briefing as to whether Mother's appeal should be dismissed as moot based on the juvenile court's post-disposition orders and termination of jurisdiction.  While DCFS did not respond, Mother submitted a supplemental letter brief, which we have reviewed.

## DISCUSSION

A.   *Mother's Pending Appeal is Not Moot*

"As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot." (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.)  " '[A]n appeal presenting only abstract or academic questions is subject to dismissal as moot.' " (*In re Jody R.* (1990) 218 Cal.App.3d 1615, 1621.)  A reversal in such a case would be without practical effect; the appeal will therefore be dismissed. (*In re Dani R.* (2001) 89 Cal.App.4th 402, 404.)

However, the appellate court may find the appeal " 'is not moot *if* the purported error is of such magnitude as to infect the outcome of [subsequent proceedings] *or* where the alleged defect

20

undermines the juvenile court's initial jurisdictional finding.' " (*In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1547, quoting *In re Kristin B.* (1986) 187 Cal.App.3d 596, 605.) We may also decline dismissal of the appeal where the jurisdictional findings could affect the parent in the future (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1432; accord, *In re Daisy H.* (2011) 192 Cal.App.4th 713, 716 [An appellate court ordinarily will not dismiss as moot a parent's challenge to a jurisdictional finding if the purported error "could have severe and unfair consequences to [the parent] in future family law or dependency proceedings"]), or where review is necessary because the issue rendered moot by subsequent events is of continuing public importance and is a question capable of repetition, yet evading review (*In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498).

"We decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether our decision would affect the outcome in a subsequent proceeding." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1404; see *In re Kristin B.*, *supra*, 187 Cal.App.3d at p. 605.)

Mother contends the juvenile court's findings and order are prejudicial to her regardless of termination of jurisdiction. She asserts she was 20 years old when dependency proceedings began and will be "stigmatized life-long as an adjudicated neglectful parent" as a result of the jurisdictional findings. She argues the allegedly erroneous jurisdictional findings could subject her to inclusion in the Department of Justice's Child Abuse Central Index (CACI) list, made available to county agencies and others conducting background searches for those seeking employment or housing, for instance. Mother argues it will have prejudicial consequences for someone like her "who wanted to choose a

21

career involving children." She states being listed on the CACI will affect her in child custody proceedings as well, and urges us to reverse the jurisdictional findings to allow her to contest inclusion in the CACI.

Mother sufficiently articulated how the findings and order could adversely affect or prejudice her. The child is very young and will remain a minor for another 15 years; it is quite possible there may be future actions regarding G.Z. in the family law context, until he reaches the age of majority. It is also plausible Father or the family law court may rely on the juvenile court's findings in making future custody or visitation orders; thus, prejudice in subsequent family law proceedings is possible, rendering Mother's appeal justiciable.

In addition, we note the California Supreme Court has granted review on the issues of (1) whether an appeal of a jurisdictional finding is moot when the parent asserts that he or she has been or will be stigmatized by the finding; and (2) whether an appeal of a juvenile court's jurisdictional finding is moot when the parent asserts that he or she may be barred from challenging placement in CACI as a result of the finding. (*In re D.P.* (Feb. 10, 2021, B301135) [nonpub. opn.], review granted May 26, 2021, S267429.) Because the findings that Mother's neglectful acts endangered G.Z., caused non-accidental trauma, and placed him at risk of serious danger and harm at least arguably continue to affect Mother adversely, we address the merits of Mother's appeal.

B. *Substantial Evidence Does Not Support the Court's Assertion of Dependency Jurisdiction*

1. Standard of Review

In reviewing a challenge to the sufficiency of the evidence

supporting jurisdictional findings and related dispositional orders, we "consider the entire record to determine whether substantial evidence supports the juvenile court's findings." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.) "Substantial evidence is evidence that is 'reasonable, credible, and of solid value'; such that a reasonable trier of fact could make such findings." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)

In making our determination, we " ' "do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773; see *In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) We uphold the juvenile court's findings unless they are " ' "so lacking in evidentiary support as to render them unreasonable." ' " (*Jamieson v. City Council of the City of Carpinteria* (2012) 204 Cal.App.4th 755, 763.) Substantial evidence is not synonymous with *any* evidence; a decision supported by a " 'mere scintilla of evidence' " need not be affirmed on appeal. (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216–217.) Further, " ' "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence.' " ' " (*Id*. at p. 217.)

2. Applicable Law

Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent . . . to adequately supervise or protect the child, or the willful or negligent failure of the child's

23

parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent . . . to provide the child with adequate . . . medical treatment[.] . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b)(1).)

A jurisdictional finding under section 300, subdivision (b)(1), requires DCFS to demonstrate the following three elements by a preponderance of the evidence: (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.) While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances at the time of the hearing subject the child to the defined risk of harm. Previous acts of neglect alone do not establish a substantial risk of future harm; there must be some reason beyond mere speculation to believe they will reoccur. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565.)

3.    <u>Analysis</u>

On appeal, Mother challenges the sufficiency of the evidence supporting count b-1 and the court's related findings. She contends DCFS had to establish G.Z.'s injuries were caused by abuse rather than his preexisting congenital medical condition. Mother argues she cannot be faulted for not having known about G.Z.'s medical condition and that he required special care as "numerous doctors and medical professionals who had examined him" did not diagnose the condition until CHLA performed further tests after Mother's fourth visit to the hospital

24

with G.Z.  Mother further argues DCFS presented no evidence of endangerment or neglect by Mother or anyone in the household at the time of the jurisdictional hearing, especially given that she had unmonitored 50/50 custodial time with G.Z. for months by the time of the hearing.

We agree with Mother.

The problem, as we view it, is this.  There is no substantial evidence in the record that the subdural hematomas were caused by abuse or neglect by Mother or anyone else in Mother's household.

The record confirms that DCFS's expert Dr. Imagawa never stated or opined that G.Z. injuries were more likely than not caused by abusive head trauma.  She opined that intracranial injuries such as subdural hematomas *"in otherwise healthy infants/children* from causes other than trauma are rare."  (Italics added.)  But G.Z. is not an otherwise healthy infant.  He has conditions like macrocephaly, the arachnoid cyst, increased subarachnoid spaces, and neomembranes, which render him more susceptible to spontaneous bleeds or to bleeds through minor non-abusive trauma or normal handling.  Expert opinion testimony constitutes substantial evidence only if based on conclusions or assumptions supported by evidence in the record; opinion testimony which is conjectural or speculative cannot rise to the dignity of substantial evidence.  (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.)

Regarding the subacute subdural hematoma surrounding G.Z.'s arachnoid cyst, Dr. Imagawa stated:  *"It is conceivable that the subacute hemorrhage noted around the cyst is related to bleeding from (rupture of) the cyst which can occur from minor trauma."*  (Italics added.)  If G.Z. did indeed hit his head during

25

the kitchen fall incident on May 23, 2020, that "could explain the subacute subdural hematoma . . . around the arachnoid cyst."

Regarding G.Z.'s older/chronic subdural hematoma, Dr. Imagawa opined the MRI brain findings of increased subarachnoid space "may be related to [G.Z.'s] developmental course, or may be the sequelae of previous head trauma; however, based on the available information *it is difficult to differentiate which is more likely*." (Italics added.) Dr. Imagawa opined it possible the MRI brain findings of increased subarachnoid space "*might* put [G.Z.] at some *increased risk to sustain subdural hemorrhage from more minor trauma*." (Second italics added.) She concluded that non-accidental/inflicted trauma as the cause of G.Z.'s older subdural hematoma "cannot be excluded."

Dr. Imagawa essentially concluded G.Z.'s subdural hematomas may or may not be caused by trauma, and that she cannot conclusively rule it out. It is not Mother's burden however, to exclude non-accidental inflicted trauma as a possible cause of G.Z.'s injuries. It is DCFS's burden to prove by a preponderance of the evidence that non-accidental trauma was the cause of injury. Because Dr. Imagawa could not categorically establish the cause of the older/chronic subdural hematoma, she stated she could not rule out nonaccidental trauma. Lack of conclusive evidence does not equate to evidence of neglect proven by a preponderance. The burden is not on Mother to disprove what DCFS had failed to prove in the first place.

In addition, general pediatrics expert Dr. Weinraub opined G.Z. had a left temporal arachnoid cyst, a medical condition that is congenital, which can "bleed spontaneously" and "cause chronic subdural hematomas." He explained G.Z. suffered from chronic neomembranes that formed in his subdural, which can "cause

26

rebleeding and expand the subdural." He agreed with Dr. Imagawa that "the subacute subdural hematoma can be a result of the arachnoid cyst and not due to significant force from inflicted trauma." He opined the arachnoid cyst caused G.Z. to suffer the bleedings with minor trauma, i.e., by "normal" or "non-abusive" handling of G.Z. The increased subarachnoid spaces made G.Z. more likely to have subdural hematomas and "reduce[d] the amount of trauma that it would take to cause bleeding because the veins are stretched." G.Z. had macrocephaly at birth and children born with macrocephaly are "more likely than not to get a subdural hematoma." Plus, the persistent vomiting G.Z. experienced "if forceful enough, could cause some bleeding."

The facts of this case are similar to *In re Roberto C.* (2012) 209 Cal.App.4th 1241. In that case, nine-month-old Roberto C. fell unconscious and was taken to the hospital, at which time a referral for neglect was made. (*Id*. at p. 1243.) The child was found to have suffered a brain bleed and "nonaccidental trauma was possible"; shaken baby syndrome was suspected. (*Id*. at p. 1244.) Per the babysitter, Roberto once hit his head on his walker while in the babysitter's care, which caused a bruise. (*Id*. at p. 1245.) DCFS discovered this was not Mother's first brush with DCFS. (*Id*. at p. 1244.) A petition was filed, alleging: Roberto was suffering from "posterior subdural hematoma, acute and chronic subdural hematomas and bilateral retinal hemorrhages" and that Roberto's parents "gave no explanations" for how he sustained the injuries, which are "consistent with non accidental [*sic*] trauma." (*Id*. at p. 1244, fn. 2.) The parents' "deliberate, unreasonable and neglectful acts" endangered Roberto's physical health and safety and placed him at risk of

27

harm and danger.  (*Ibid*.)  The parents "failed to obtain timely necessary medical treatment for the child's injuries."  (*Ibid*.)  The parents "knew, or reasonably should have known, that the child was being physically abused and failed to protect the child" which further endangers the child's physical health and safety.  (*Ibid*.)

The doctor who examined Roberto is the medical director of the Child Crisis Center at Harbor–UCLA Medical Center and a member of the Suspected Child Abuse and Neglect (SCAN) Team; the doctor was found by the juvenile court to be an expert in child abuse.  (*In re Roberto C.*, *supra*, 209 Cal.App.4th at p. 1246.)  The doctor "found bruising on his ear, retinal hemorrhages, and subdural fluid and hemorrhage."  (*Ibid*.)  The subdural blood injury occurred three to seven days prior to admission.  (*Ibid*.)  The doctor agreed with other doctors that Roberto C.'s injuries were due to "inflicted trauma."  (*Id*. at p. 1247.)

The juvenile court granted the parents' motion to dismiss the petition (joined in by minor's counsel) because DCFS had not met its burden of proof, in that there was insufficient evidence to find that the injury was not accidentally inflicted and that DCFS pointed to "no evidence linking the parents to the infliction of the injuries."  (*In re Roberto C.*, *supra*, 209 Cal.App.4th at pp. 1248, 1254.)  On appeal, the reviewing court affirmed and found the juvenile court did not abuse its discretion in determining that DCFS failed to meet its burden of proof.  (*Id*. at pp. 1253, 1256.)  The reviewing court found there was "no evidence that provides any basis to attribute knowledge to these parents that Roberto was being abused, much less severely abused within the meaning of the statute."  (*Id*. at p. 1254.)  The court further explained, "The recognition that circumstantial evidence may support a finding despite the inability to identify the perpetrator does not,

however, lead to the conclusion that a court may presume both that the parents knew, or should have known that the child was injured, and knew, or should have known who the perpetrator was, to support a finding against the parents." (*Id*. at p. 1255.) "The facts contained in th[e] record do not create a level of certainty concerning the parents' knowledge sufficient to find an abuse of discretion by the juvenile court." (*Id*. at p. 1256.)

Unlike the child Roberto C., who had bruising on his ear, retinal hemorrhages, and subdural fluid and hemorrhaging, G.Z. had no retinal hemorrhages, no bruising, and no fractures when examined during Mother's multiple visits with him to the hospital. It is undisputed G.Z. exhibited no signs of having suffered noncontact injury, such as shaken baby syndrome or acute head trauma syndrome. G.Z.'s pediatric ophthalmology consultation notes dated June 2, 2020 revealed "no evidence of retinal hemorrhages or other signs of ocular trauma." A skeletal survey showed no evidence of fractures. On June 4, 2020, the CSW observed no marks or bruises on G.Z.'s head and body. A physical examination conducted on June 15, 2020 also showed "[n]o bruising or other signs of external trauma." During the hearing on January 22, 2021, pediatrics expert Dr. Weinraub opined G.Z. does not suffer from shaken baby syndrome because the there was no indication of abuse, i.e., "injuries . . . caused by acceleration and deceleration injury, for example, retinal hemorrhages," "classic metaphysical lesions," "rib fractures." There was "no indication that this child has suffered any sort of abuse or neglect" and did not find in G.Z. signs indicative of a shaken baby case. The record includes numerous medical reports and notes about G.Z. and none mention any bruising, broken

bones, fractures, or retinal hemorrhage—things ordinarily seen in shaken babies.

We agree with the reviewing court in *Roberto C.* that circumstantial evidence may support a finding of abuse but does not mean the court may conclude or presume a finding that the parents knew or should have known the child was injured and who the perpetrator was. (See *In re Roberto C.*, *supra*, 209 Cal.App.4th at p. 1255.) Here, Mother did not know until after her fifth visit with G.Z. to a hospital that he suffered from an arachnoid cyst, increased subarachnoid spaces, and neomembranes, which render him more susceptible to spontaneous bleeds via normal handling or non-abusive minor trauma. There was no evidence of physical abuse, via either contact injury or noncontact injury, inflicted by Mother or her relatives. Just because one doctor (Dr. Imagawa) stated she could not categorially establish the cause of G.Z.'s chronic/older subdural hematoma solely from the cyst or increased subarachnoid space as opposed to nonaccidental trauma does not equate to a finding of abuse and that Mother was neglectful and should have known G.Z. was injured.

Next, DCFS argues there were inconsistencies in Mother's recollection of how/when G.Z. fell. We disagree.

Mother's recollection of the co-sleeping incident where G.Z. fell from the bed onto the carpeted floor sometime in April 2020 was similar to and/or nearly identical to MA's recollection. MA was awake and heard a "loud thump" and went into the bedroom to discover Mother consoling G.Z. MU, minor MU, and MGF all reported Mother informed them of the falling incident when it occurred two months prior (in April). Based on the record before

30

us, there is no "inconsistency" in their recollection of when the falling incident took place.

Similarly, Mother's recollection of G.Z.'s falling incident in the kitchen while with MGF coincided with what MGF recalled. About "17–20 days ago," G.Z. tried to walk on his own in the kitchen while being assisted by MGF but lost his balance and fell. MA stated G.Z. "likes to try to walk on his own and fell." Mother later confirmed the exact date of this falling incident as May 23, 2020 by reviewing her text messages. Again, we see no material discrepancy in their recollections of when and how G.Z. fell.

In sustaining count b-1, the court made findings on the record, which Mother disputes on appeal. The court found G.Z. "would not have suffered the injuries except for the unreasonable or neglectful acts of the Mother." The court "was troubled by the fact that Mother's own expert talked about possibly neglectful or unreasonable acts." The court continued: "And I want to be very clear that it is not just about co-sleeping. [T]he court has [a] child that has had multiple subdural hematomas, multiple bleeds while in the custody of the Mother, and since the child has been in the custody of the Father [and] since they've been sharing custody and they have a parenting plan, there hasn't been any new injuries."

First, we are perplexed by the court's comment that it "was troubled by the fact that Mother's own expert talked about possibly neglectful or unreasonable acts." Dr. Weinraub did state that co-sleeping with a child of this age is "considered not appropriate by the American Academy of Pediatrics," but also confirmed there is no evidence Mother's co-sleeping with G.Z. caused him any harm. Dr. Weinraub never qualified any act or conduct by Mother as neglectful. To the contrary, Dr. Weinraub

31

specifically found no signs of medical neglect by Mother and thought she did "an exemplary job" and alluded to the fact that she took G.Z. to the hospital five times in nine days. Dr. Imagawa stated Mother "was diligent in seeking consistent routine pediatric care for [G.Z.] as well as . . . diligent and persistent in appropriately continuing to seek care for [his] symptoms of vomiting." Mother stated in her March 22, 2021 declaration that it was due to her insistence for further testing that G.Z.'s subdural hematomas were discovered. G.Z. was first diagnosed with gastroenteritis. CHLA "wanted to release" G.Z. on May 31, 2020, Mother "would not consent to his release" and "asked for further testing to see what was causing [G.Z.] to vomit"; it was then when CHLA performed further testing, including the CT head scan, which lead to discovery of G.Z.'s subdural hematomas.

Furthermore, to the extent Mother's act of co-sleeping with G.Z. is being deemed a "neglectful" act, this was never pled as a means of endangerment by Mother in the section 300 petition and nothing in the record suggests the petition was amended to include such an allegation. Additionally, none of G.Z.'s medical records specify G.Z. was injured because or as a result of Mother co-sleeping with him.

As for the court's finding that there was no showing of further injury to G.Z. after he was placed in Father's care, the evidence in the record proves otherwise. G.Z. was placed in Father's care on June 5, 2020. More than a month later, during G.Z.'s neurosurgery clinic visit on July 8, 2020, a recent MRI revealed "*an increase in size of the . . . left (older) subdural hematoma.*" (Italics added.) There was no evidence in the record that would explain the increase in size of the left, older subdural

hematoma while G.Z. was in Father's care.  No incident of minor trauma was reported during the normal handling of G.Z. that would explain the enlargement of a hematoma while G.Z. was in Father's care.

Finally, by the time of the March 2021 adjudication hearing in G.Z.'s case, his familial circumstances had undergone huge changes.  G.Z. was no longer in Mother's sole physical custody, as was the situation at the onset of DCFS involvement in June 2020, where both Mother and Father confirmed Father was not involved in G.Z.'s life for the last nine months.  Rather, at the time of adjudication, physical custody of G.Z. was split 50/50 between Mother and Father, and G.Z. was staying overnight at Mother's home, unmonitored, during her custodial timeshare.

G.Z.'s arachnoid cyst was reportedly stabilized as of September 29, 2020 based on MRI results.  Since then, no additional hematomas or brain bleeds were reported or found. Mother's visits with G.Z. were unmonitored as of November 10, 2020 and both parents informed the court they planned G.Z. would spend Thanksgiving Day, Christmas Day, and New Year's Day with Mother.  Reports of Mother's visits with G.Z. were positive.  She was described as being cooperative and having "an emotional bond" with G.Z.  Since January 5, 2021, custody of G.Z. was split 50/50 between Mother and Father, with a 2-2-5 custodial plan in place.

During this entire time leading up to and including the adjudication hearing, nothing in the record supports a finding of substantial risk of serious physical harm to G.Z. based on abuse or neglect by Mother.  The risk of harm exists at the time of the adjudication hearing at which time the court declares jurisdiction over the minor.  (*In re J.M.* (2019) 40 Cal.App.5th 913, 921.)

33

Here, there is no evidence, let alone substantial evidence, that G.Z. was at a risk of harm from Mother during the March 24, 2021 hearing as a result of abuse or neglect or non-accidental trauma. Perceptions of risk, rather than actual evidence of risk, do not suffice as substantial evidence. (*Nahid H. v. Superior Court* (1997) 53 Cal.App.4th 1051, 1070.) Based on the record before us, a finding of substantial risk of serious physical harm to G.Z. based on Mother's abuse or neglect would be based on speculation.

Based on our review of the entire record before us, we conclude the juvenile court's jurisdictional findings are not supported by substantial evidence. Because we reverse the jurisdictional findings, the related dispositional orders must also be reversed. (*In re David M.* (2005) 134 Cal.App.4th 822, 833 [reversal of the jurisdiction order resulted in all subsequent orders being vacated as moot], abrogated in part on another ground by *In re R.T.* (2017) 3 Cal.5th 622, 628.)

C.     *Section 355.1, Subdivision (a) Presumption*

1.     Applicable Law

Section 355.1, subdivision (a) provides: "Where the court finds, *based upon competent professional evidence*, that *an injury*, injuries, or detrimental condition sustained by a minor is of a nature as *would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of either parent*, the guardian, or other person who has the care or custody of the minor, *that finding shall be prima facie evidence* that the minor is a person described by subdivision (a), (b), or (d) of Section 300." (§ 355.1, subd. (a), italics added.) The presumption created by subdivision (a) constitutes a presumption affecting the burden of producing evidence. (*Id.*, subd. (c).)

34

Once DCFS establishes a prima facie case that a child is subject to dependency jurisdiction because he or she has sustained an injury " 'of a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions' " of a caregiver, the burden of producing evidence shifts to the parents the obligation of raising *an issue as to the actual cause of the injury* or the fitness of the home. (*In re D.P.* (2014) 225 Cal.App.4th 898, 903; *In re A.S.* (2011) 202 Cal.App.4th 237, 242–243, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) If the parents raise rebuttal evidence, the county child welfare agency maintains the burden of proving the alleged facts. (*In re A.S.*, at p. 243.)

"The effect of a presumption affecting the burden of producing evidence is to require the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption." (Evid. Code, § 604.) A presumption affecting the burden of proof imposes a much more onerous burden, placing the burden on the opposing party to disprove the presumed fact by a preponderance of the evidence or other appropriate standard. (*Id.*, § 606; *In re Heather B.* (1992) 9 Cal.App.4th 535, 560–561.)

2.    Analysis

Mother argues the juvenile court informed the parties it was relying on section 355.1's presumption to support the b-1 allegation "without advance notice, on March 24, 2021, after all argument had been presented and the parties had rested."

35

Mother further argues DCFS never alleged it would rely on section 355.1 and the court never notified her of its intent to do so "until all parties had argued and submitted the case, depriving Mother of due process by shifting last minute the burdens of proof and producing evidence without recognizing that the basis for that shift no longer applied." Mother argues the application of section 355.1 violated her right to due process because she was never given notice that DCFS or the court intended to rely on this statute. Mother further argues the presumption was rebutted by evidence in her favor.

The record before us shows DCFS never plead, alleged, or argued the provisions of section 355.1 nor notified it would rely on its provisions. To the contrary, DCFS argued during adjudication that count b-1 was supported by a preponderance of the evidence. After the juvenile court heard argument from Mother, Father, DCFS, and minor's counsel, and after all parties submitted and rested their case, the juvenile court thereafter stated its ruling and cited to section 355.1, subdivision (a) and the presumption affecting the burden of producing evidence.

In support of her contention, Mother cites *In re A.S.*, *supra*, 202 Cal.App.4th at pp. 242–243. In that case, the reviewing court held DCFS forfeited reliance on section 355.1, by failing to cite that section in the jurisdictional petition, thereby failing to provide the parents with sufficient notice. (*In re A.S.*, at p. 243 [When DCFS intends to rely on section 355.1, subdivision (a) "to shift the burden of production to the parents to show that neither they *nor other caretakers* caused the child's injuries, it must do so in a clear-cut manner. It should, of course, cite section 355.1, subdivision (a) in the petition along with the applicable subdivision of section 300."].) The parties in *In re A.S.* had not

36

addressed section 355.1 or its rebuttable presumption at the jurisdictional hearing. (*Ibid*.)

DCFS contends Mother's reliance on *In re A.S.* is misplaced and that the more recent *In re D.P* controls. *In re D.P.* declined to follow the reasoning in *In re A.S.*; notice that DCFS intended to rely on the presumption was adequate where the mother was represented by an attorney, the petition's charging allegations were worded in the language of section 355.1, subdivision (a), and the mother was informed of the petition's allegations and the evidence DCFS intended to rely on, including multiple doctors concluding that the child's trauma was nonaccidental. (*In re D.P.*, *supra*, 225 Cal.App.4th at p. 904.) The petition in that case incorporates the language of section 355.1, subdivision (a), and states, in relevant part, that D.P's injuries " 'would not ordinarily occur except as a result of deliberate[,] unreasonable and neglectful acts by the mother.' " (*Ibid*.)

In the case before us, count b-1 of the petition includes the allegation: The injuries were consistent with "non-accidental trauma" and would not ordinarily occur but for "deliberate, unreasonable, and neglectful acts" by Mother who had care and custody of G.Z. Thus, the petition does incorporate the language of section 355.1, subdivision (a) to an extent, and we reject Mother's assertion that she lacked notice of DCFS's intent to rely on section 355.1.

However, " '[w]hen the party against whom such a presumption operates produces some quantum of evidence casting doubt on the truth of the presumed fact, the other party is no longer aided by the presumption. The presumption disappears, leaving it to the party in whose favor [the presumption] initially worked to prove the fact in question.' "

37

(*Estate of Trikha* (2013) 219 Cal.App.4th 791, 803.)  Thus, section 355.1 operates to " 'shift to the parents the obligation of raising an issue *as to the actual cause of the injury* or the fitness of the home.' " (*In re A.S., supra*, 202 Cal.App.4th at pp. 242–243, quoting *In re James B.* (1985) 166 Cal.App.3d 934, 937, fn. 2.)  If the parents do raise rebuttal evidence, DCFS shoulders the burden of proving the facts alleged in the petition.  (*In re A.S.*, at p. 243.)

Here, as set forth in the preceding section, Mother presented evidence that G.Z.'s subdural hematomas were not the result of abuse or negligence by her, rebutting the presumption of section 355.1, subdivision (a).  Mother's family members who were interviewed all told the CSW they have no concerns of neglect or physical abuse by Mother.  Dr. Weinraub provided expert testimony indicating Mother was not neglectful of G.Z. who did not exhibit any sign of shaken baby syndrome or nonaccidental trauma.  He opined that the subdural hematomas are a result of G.Z.'s congenital medical conditions including macrocephaly, an arachnoid cyst, increased subarachnoid spaces and neomembranes, which made him more susceptible to spontaneous bleeds or to bleeds resulting from minor non-abusive trauma or normal handling.

Because Mother provided rebuttal evidence, the burden shifted back to DCFS to prove the petition's allegations.  As explained above, substantial evidence does not support the juvenile court's jurisdictional findings related to count b-1.

We reverse.

## DISPOSITION

The juvenile court's jurisdictional findings and order are reversed.  The matter is remanded to the juvenile court with directions to dismiss the petition.

**CERTIFIED FOR PUBLICATION**


STRATTON, P. J.

I concur:


GRIMES, J.


WILEY, J.

39